IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TREY LOGAN DAVIS,                     §
TDCJ #1353193,                        §
　　　　　　　Plaintiff,              §
                                      §
v.                                    §        CIVIL ACTION NO. H-06-2381
                                      §
SHERIFF CHRIS KIRK, *et al.*,         §
　　　　　　　Defendants.             §

## MEMORANDUM AND ORDER

State inmate Trey Logan Davis has filed this action under 42 U.S.C. § 1983, alleging violations of his civil rights while he was in custody at the Brazos County Jail. Davis, who proceeds *pro se* and *in forma pauperis*, has filed an amended complaint in this case against Brazos County Sheriff Chris Kirk, Sergeant Pauline Alonzo, also of the Brazos County Sheriff's Department, and Dr. Rany Cherian, who is employed as a physician at the Brazos County Jail. (Doc. # 22). Sheriff Kirk and Sergeant Alonzo have filed a joint amended motion to dismiss or, in the alternative, a motion for summary judgment. (Doc. # 27). Dr. Cherian has filed a separate amended motion to dismiss or, in the alternative, motion for summary judgment. (Doc. # 28). There have been numerous responses, declarations, and supplements to the defendants' amended motions. The pending motions are considered below along with the plaintiff's responses, the exhibits, and the applicable law.

I.　　　**BACKGROUND**

Davis is presently in custody of the Texas Department of Criminal Justice - Correctional Institutions Division (collectively, "TDCJ"), at the Michael Unit, pursuant to

a felony conviction that was entered against him in Brazos County.[1]  Davis does not

challenge his conviction here or the conditions of his confinement in TDCJ.[2]  Rather, his

complaint concerns the conditions of his confinement at the Brazos County Jail, where he

was in custody from January 23, 2004 through March 13, 2006, as a pre-trial detainee.

Davis sues Brazos County Sheriff Chris Kirk and Sergeant Pauline Alonzo, who is

employed by the Brazos County Sheriff's Department as Director of Nurses for the Jail.

Davis also sues Dr. Rany Cherian, who is employed by Brazos County to work as a

physician at the Jail.  According to the amended complaint, Davis contends that Sheriff Kirk

violated his constitutional rights by assigning him to unsafe housing and that all of the

defendants are responsible for denying him medical care in the form of surgery as well as

adequate pain management for a badly broken right arm.

Davis explains that his right arm was broken in a car accident in April of 2003, while

---

[1]     Davis was arrested in January of 2004, along with his older brother, and charged in connection with a "drug-related" murder in Brazos County.  *See Ex parte Davis*, 147 S.W.3d 546 (Tex. App. — Waco 2004, no pet.).  Prison records show that Trey Davis's older brother, Chad Fenley Davis (TDCJ #1336883), was convicted of capital murder in that case and sentenced to life imprisonment in 2005.  In 2006, Davis pled guilty in the 85th District Court of Brazos County, Texas, to charges of robbery and burglary of a habitation.  *See Davis v. State*, 205 S.W.3d 606 (Tex. App. — Waco 2006, no pet.).  Pursuant to the terms of a negotiated plea agreement, Davis received consecutive terms of twenty years' imprisonment in each of those cases.  *See id.*

[2]     The original complaint filed by Davis argued that his guilty plea was involuntarily made as a result of poor conditions of confinement at the Brazos County Jail.  Because this claim is not included in the amended complaint, it appears that this claim was withdrawn.  Davis repeats this allegation in other pleadings.  (Doc. # 48, Plaintiff's Sworn Declaration).  To the extent that this claim was not withdrawn, any challenge to Davis's conviction is barred by the rule in *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), because the conviction has not been overturned or set aside.

2

he was out of custody, and that he had surgery at that time to install a metal rod and screws to stabilize his fractured humerus.[3]  Davis contends that, when he was arrested and placed in custody of the Brazos County Jail on January 23, 2004, he advised the medical department that the fracture had not healed and that the bone was loose. An x-ray taken on March 3, 2004, revealed a "non-union fracture," meaning that the broken bone had not healed.  The x-ray further confirmed that the screws attached to the metal rod in Davis's arm had broken or had become dislodged.

After reviewing the March 3, 2004 x-ray, Jail medical personnel attempted to find a local surgeon to operate on Davis's arm.  In July of 2004, Davis was referred for an examination by a local orthopedic surgeon, Dr. Rick Seabolt. Davis alleges that Dr. Seabolt recommended surgery for Davis's arm and cautioned that "if the fractures remained untreated [then] amputation could result."[4]  (Doc. # 22, Amended Complaint, ¶ 22).  Medical records reflect that Dr. Seabolt recommended surgery, and agreed to perform the procedure if financial arrangements could be made.  Davis's father, Willie Davis, agreed to pay for the surgery and informed Jail medical staff that he would make financial arrangements with Dr. Seabolt's office.  In the mean time, Davis was prescribed Tylenol and arthritis medication

---

[3]      The humerus is "the bone that extends from the shoulder to the elbow articulating proximally with the scapula and distally with the radius and ulna[.]" DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 886 (31st ed. 2007).

[4]      Davis claims that he was examined by Dr. Seabolt in April of 2005.  (Doc. # 22, Amended Complaint, ¶ 22).  Davis's medical records, which are summarized further below, show that Davis was examined by Dr. Seabolt for the first time in July of 2004, and thereafter in October of 2004.

for his pain.

On October 27, 2004, Davis "became involved in a physical altercation" with another inmate at the Jail.  (Doc. # 22, Amended Complaint, ¶ 18).  The next day, on October 28, 2004, Davis was admitted to St. Joseph's Regional Health Center for treatment of the unspecified injuries that he sustained during the altercation. While at St. Joseph's, an unidentified "attending physician" also reportedly recommended surgery for Davis's broken right arm.  (*Id.* at ¶ 19).

Davis alleges that his broken arm caused him to suffer pain every day that he was at the Jail.  In March of 2005, Davis reportedly developed ulcers in his stomach from the pain medication that he had been prescribed by Dr. Cherian.  (Doc. # 48, Plaintiff's Sworn Declaration, ¶ 41).  Davis contends that he complained about "blood in his stool" and that he was "vomiting blood" as a result of the ulcers in his stomach.  (*Id.*).  Davis alleges that Dr. Cherian told him that she could not treat both his pain and his stomach ailment because the pain medication was causing his stomach ulcers.  (*Id.*).

In July of 2005, which is a year after Davis's initial examination by Dr. Seabolt, Davis still had not received the recommended surgery and his pain purportedly continued to worsen.  Davis filed a motion to reduce his bond so that he might get out of Jail and have the surgery.  In a hearing before the trial court on July 8, 2005, another surgeon named Dr. Mark Sanders testified that he would perform the necessary surgery in Houston for $9,000.  At that time, it appears that Willie Davis was still prepared to pay for his son's surgery.  The trial court denied the motion to reduce bond, but ordered Brazos County to transport Davis to the

4

care of a local surgeon (*i.e.*, Dr. Seabolt) for the procedure once Davis's family had made the appropriate financial arrangements.

On October 28, 2005, Dr. Seabolt's office reportedly spoke with Davis's father, who told them that he would not be able to pay for his son's surgery because all of his assets had been "seized" by the Internal Revenue Service.  Davis was advised by Jail medical staff that, if he were able to make other financial arrangements for the surgery, then Jail officials would schedule the proceeding.  In the interim, Davis would continue to receive pain medication to relieve his discomfort.

It appears that Davis entered a guilty plea to the charges against him in February of 2006.  On March 13, 2006, Davis was transferred to TDCJ.  Shortly thereafter, Davis had surgery on his arm. By then, however, Davis claims that his right arm was permanently damaged as the result of the extended delay in receiving surgery.

In his amended complaint, Davis claims that Sheriff Kirk was deliberately indifferent to his health and safety by assigning him to an upper bunk.  Davis reportedly had difficulty climbing into the upper bunk because of his broken right arm.  Davis states that he wrote a letter to Sheriff Kirk on an unspecified date, requesting surgery for his arm, but that Sheriff Kirk ignored his complaints of pain.  (Doc. # 22, Amended Complaint, ¶ 15).  Davis contends, therefore, that Sheriff Kirk denied him medical care in the form of surgery and that Sheriff Kirk was further deliberately indifferent to his need for appropriate housing.  (*Id.* at ¶¶ 16-17).

Davis also complains that Dr. Cherian would not authorize the surgery recommended

5

by Dr. Seabolt. (*Id.* at ¶¶ 20, 23). Davis alleges further that he was denied adequate medical care in the form of "pain management" for his broken arm. (Doc. # 22, Amended Complaint, ¶ 12). Davis complains that he received only Tylenol for his pain. (*Id.* at ¶ 13). Other pleadings filed by Davis reflect that he was also prescribed various drugs used to treat arthritis pain. Davis contends that the medication that he was given was not effective to treat his pain and that its long-term use caused him to suffer gastrointestinal distress. (*Id.*). Davis appears to blame both Dr. Cherian and Sergeant Alonzo for the alleged failure to provide adequate pain management.

Davis complains that the defendants have violated the Eighth Amendment to the United States Constitution and that Sheriff Kirk's actions with respect to his housing assignment further violated Texas law, as well as the Americans with Disabilities Act (the "ADA"). (Doc. # 22, Amended Complaint, ¶¶ 16, 26-30). Davis seeks nominal damages and punitive damages in the amount of $90,000.00 from each of the defendants in their official and individual capacities.[5]

Sheriff Kirk and Sergeant Alonzo have filed an amended motion to dismiss or, in the alternative, for summary judgment, arguing that Davis's allegations fail as a matter of law.

---

[5]   Davis also seeks a declaratory judgment and injunctive relief in the form of surgery for his arm. Davis discloses in pleadings that he had surgery on his arm after his transfer to TDCJ. Because Davis is now in state prison and no longer in custody of Brazos County, his request for injunctive relief is moot and cannot be considered. *See Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002); *see also Cooper v. Sheriff, Lubbock County, Tex.*, 929 F.2d 1078, 1084 (5th Cir. 1991) (holding that an inmate's transfer from county jail to state prison rendered moot his claims for injunctive relief).

(Doc. # 27).  Dr. Cherian has filed a similar amended motion to dismiss that includes an alternative motion for summary judgment.  (Doc. # 28).  Davis filed a preliminary response to the defendants' motions, along with a declaration, and he requested discovery.  (Docs. # 34, # 35).  In an order entered on June 11, 2007, the Court granted a continuance to allow discovery of Davis's medical records and gave notice that any motion to dismiss filed in this case would be construed as a motion for summary judgment under Rule 56(f) of the Federal Rules of Civil Procedure.  (Doc. # 45).  Since then, the defendants have supplemented the record with copies of Davis's medical records and they have also supplemented their motions for summary judgment with additional argument on the issue of qualified immunity.  (Docs. #47, # 50, # 53, #54, #55, #56).  Davis has also supplemented the record with exhibits and he has filed an additional response to the defendants' motions.  (Docs. # 48, #49, #59).  The defendants have filed an additional reply.  (Doc. # 60).  The parties' contentions are addressed below under the governing standard of review.

## II.    <u>STANDARD OF REVIEW</u>

The defendants' motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56, a court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The moving party bears the burden to show that "there is an absence of evidence to support the nonmoving party's case."  *Celotex*

7

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Capitol Indem. Corp. v. United States*, 452 F.3d 428, 430 (5th Cir. 2006).

Once the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  The nonmovant cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  To survive a motion for summary judgment, the nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause of action. *See Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003) (citation omitted).  Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party.  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).  Where the non-moving party fails to establish "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," no genuine issue of material fact can exist.  *Celotex*, 477 U.S. at 322-23; *Whiting v. University of Southern Miss.*, 451 F.3d 339, 345 (5th Cir. 2006).

The plaintiff proceeds *pro se* in this case.  Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).  Under this standard, pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them.  *See id*; *Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002).

Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

## III.   DISCUSSION

At the outset, the defendants move for summary judgment on the grounds that Davis failed to exhaust his administrative remedies. Alternatively, the defendants argue that Davis's claims fail for other reasons. Sheriff Kirk and Sergeant Alonzo argue that they are entitled to immunity from the claims lodged against them in their official capacity. Dr. Cherian argues that the claims against her must be dismissed because she is not a "state actor." All of the defendants argue that they are entitled to qualified immunity from Davis's claims. These arguments are addressed in turn below, beginning with the exhaustion of administrative remedies.

### A.   Exhaustion of Administrative Remedies

All of the defendants move for summary judgment on the grounds that Davis failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act (the "PLRA"), codified as amended at 42 U.S.C. § 1997e(a). This portion of the PLRA prohibits any action by a prisoner in federal court under 42 U.S.C. § 1983 concerning "prison conditions" until "such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has repeatedly emphasized that § 1997e(a) mandates exhaustion of *all* administrative procedures before an inmate can file any suit challenging prison conditions. *See Booth v. Churner*, 532 U.S. 731, 739 (2001); *Porter v. Nussle*, 534

9

U.S. 516, 524 (2002); *Woodford v. Ngo*, — U.S. —, 126 S. Ct. 2378, 2382-83 (2006); *see also Jones v. Bock*, — U.S. —, 127 S. Ct. 910 (2007) (confirming that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court"). Because Davis's claim concerns the conditions of his confinement at the Brazos County Jail, he was required to exhaust his remedies under § 1997e(a) before filing suit in federal court.

There is a grievance procedure in place at the Brazos County Jail, which was adopted in compliance with the Texas Commission on Jail Standards Rules and Regulations.[6] (Doc. # 27, Exhibit 5, *Inmate Grievance Plan*, at ¶ 9.01.001). Under the Brazos County Inmate Grievance Plan, inmates may file a formal grievance for the following reasons: (a) a violation of civil rights; (b) criminal acts against the inmate; (c) the abridgement of any inmate privilege; or (d) any proscribed act by an on-duty Jail Officer. (*Id.* at ¶ 9.03.001). The Inmate Grievance Plan details a formal three-step procedure for exhausting administrative complaints. The grievance procedure entails an initial written grievance by the inmate to the Brazos County Sheriff's Department Grievance Board, which will review the allegation and issue findings, conclusions, and a recommendation to the Jail Administrator. (*Id.* at ¶¶ 9.05 – 9.10). If the initial grievance is denied or resolved in a manner that is unacceptable to the inmate, the grievance must be challenged on appeal to the Jail

---

[6]    Sheriff Kirk and Sergeant Alonzo have included exhibits detailing the grievance policy in place at the Brazos County Jail, along with the record of Davis's grievances. (Doc. # 27, Exhibits 1-10). Dr. Cherian has adopted those exhibits and moves for summary judgment on the issue of exhaustion as well. (Doc. # 28, Motion, at 2).

Administrator.  (*Id.* at ¶ 9.12).  If an appeal to the Jail Administrator is unsuccessful, the inmate must then complete a final appeal to the Sheriff.  (*Id.* at ¶ 9.13).

The Inmate Grievance Plan states that inmates will be informed of the availability of the grievance procedure in the Inmate Rules and Regulations, which are provided to all inmates when they are admitted to the Brazos County Jail facility.  (*Id.* at ¶ 9.02).  The Brazos County Inmate Rules and Regulations are set forth in the Inmate Handbook, which provides a description of the Inmate Grievance Plan.  (Doc. # 27, Exhibit 6, *Inmate Rules and Regulations*, at ¶ XI).  This portion of the Inmate Rules and Regulations explains the three-step procedure for filing an initial grievance, the process for submitting a written "appeal request" to challenge the initial finding, and the process for disputing the result of an appeal by requesting review by the Sheriff.  (*Id.* at ¶ XI(B)).

According to an affidavit from Brazos County Jail Commander Wayne Dicky, the Brazos County Sheriff's Department has had this grievance process in place since at least May of 2000.  (Doc. # 27, Exhibit 7, *Dicky Affidavit* at ¶ 6).[7]  Dicky states that Davis received a copy of the Inmate Handbook, which describes the Inmate Grievance Plan, when he was admitted to the Jail.  (*Id.* at ¶ 11).  In support, Dicky points to Brazos County Jail Property Issue Forms signed by Davis upon his admission to the Jail, which demonstrate that Davis acknowledged receipt of the Inmate Rules and Regulations and that he received an

---

[7]     The affidavit from Wayne Dicky that is submitted in support of the defendants' motion for summary judgment is unsigned.  The defendants have supplemented the record, however, to include a signed copy of that affidavit.  (Doc. # 29).

11

inmate orientation, which would have included notice of the grievance process.  (*Id.*; *see also* Doc. # 27, Exhibit 10, Brazos County Jail Property Issue Forms for Trey Logan Davis).

The defendants argue that Davis did not exhaust his administrative remedies by presenting the substance of his claims in an initial grievance.  The defendants argue further that, to the extent that he did present claims in an initial grievance, Davis failed to complete the grievance process by filing an appeal.  Liberally construed, Davis's amended complaint outlines the following general claims:  (1) that Sheriff Kirk  failed to protect him from harm by assigning him to inadequate housing in an upper bunk with deliberate indifference to a disability; (2) that all of the defendants denied him medical care in the form of surgery for his broken arm; and (3) that all of the defendants were deliberately indifferent to his need for adequate pain management.  (Doc. # 22, Amended Complaint).  Each of these allegations is examined separately below to determine if Davis exhausted his administrative remedies by presenting the substance of his claims as required under the grievance plan in place at the Jail.

### 1.    Failure to Protect — Inadequate Housing Assignment

Davis alleges that he was assigned to a top bunk in spite of the fact that he had a broken arm.  Davis complains further that, because his injury made him vulnerable to further harm, Sheriff Kirk was deliberately indifferent to his need for safe housing in violation of the Eighth Amendment, the Americans with Disabilities Act, and Texas law, among other provisions.  Dicky reports that, although Davis filed numerous grievances, he "never filed any grievance related to his housing assignment or classification."  (Doc. # 27, Exhibit 7,

*Dicky Affidavit* at 13).  Davis's grievances are in the record.  (Doc. # 27, Exhibit 9).  A review of those grievances confirms that Davis did not file any formal complaint about his bunk assignment or the adequacy of his housing.  Likewise, Davis did not file any grievance complaining that, as a result of his broken arm, his housing assignment made him vulnerable to assault by other inmates.

Davis does not show that he attempted to file a grievance with regard to these claims. Davis's failure to file a grievance containing the factual allegations of his housing claim, or his assertion that his cell assignment was inadequate to protect him from harm, constitutes a failure to exhaust available administrative remedies.  The Supreme Court has emphasized that the exhaustion requirement found in the PLRA, 42 U.S.C. § 1997e(a), mandates "proper exhaustion," which demands compliance with prison procedural rules.  *Ngo*, — U.S. —, 126 S. Ct. at 2387.  Because § 1997e(a) expressly requires exhaustion, prisoners may not deliberately bypass the administrative process by flouting an agency's procedural rules.  *See id.*, 126 S. Ct. at 2389-90.  Because Davis has failed to raise a genuine issue of material fact, the defendants are entitled to summary judgment on this claim.

### 2.    Denial of Adequate Medical Care — Surgery

Davis claims that Dr. Cherian refused to authorize surgery to repair his broken right arm.  (Doc. # 22, Amended Complaint, ¶¶ 22-23).  He appears to blame Sheriff Kirk and Sergeant Alonzo as well for their refusal to provide him with adequate medical care in the form of surgery for his broken arm.

The record reflects that Davis filed a grievance on February 28, 2006, complaining

the "the jail physician has refused to authorize the surgery" recommended by Dr. Seabolt. (Doc. # 27, Exhibit 9, Grievance dated Feb. 28, 2006). There is an administrative response to Davis's February 28, 2006 grievance.  Grievance Officer L. Sifuentez investigated the grievance and issued a written finding that Davis's claim concerning the alleged refusal of medical treatment was "unfounded."  (Doc. # 27, Exhibit 9, Grievance Response dated March 13, 2006).  Officer Sifuentez noted that Davis's medical condition was "well documented" and that, "[a]lthough the surgery was recommended, it was not considered to be an 'emergency.'" (*Id.*).

It is not clear why Davis waited until February 28, 2006, shortly before his transfer to TDCJ on March 13, 2006, to file a grievance concerning the alleged denial of surgery that was recommended in July of 2004.  It is possible that Davis delayed as he did because his father, Willie Davis, had previously agreed to pay for the surgery.  The record shows, however, that the medical department was advised on October 28, 2005 that Willie Davis could not pay for the surgery.  Presumably, therefore, the February 28, 2006 grievance concerns an alleged failure to provide the surgery at County expense following Willie Davis's admission that he could not afford to pay for the procedure.

It is also not clear from this record whether the February 28, 2006 grievance, which was filed shortly before his Davis's transfer to TDCJ on March 13, 2006, was sufficient to place Jail officials on notice that Davis believed Brazos County should be financially responsible for the procedure that he needed. The defendants do not provide specific information about whether they had sufficient notice of Davis's need for surgery at the

14

County's expense.

Further, the defendants argue that Davis did not exhaust his administrative remedies as required by § 1997e(a) because he did not complete the three-step grievance procedure in place by filing an appeal from the administrative response.  Davis concedes that he did not appeal from the result that he received from his February 28, 2006 grievance.  Davis contends, however, that he did not receive any instructions informing him that an appeal was required.[8]  Davis argues, therefore, that he sufficiently exhausted his complaint.  (Doc. # 22, Amended Complaint, at ¶ 7).

The defendants dispute Davis's claim that he was not provided with a complete version of the Inmate Handbook along with the Jail grievance plan upon his arrival at the Jail in January of 2004.  The defendants note that, even if Davis did not receive a complete

---

[8]     Davis asserts that the Inmate Handbook that he received when he arrived at the Jail did not contain information about the three-step process outlined by Dicky.  In support, Davis provides an undated one-page form that purports to be the "Inmate Handbook" for the "Brazos County Office of the Sheriff, Jail Instructions and Services." (Doc. # 49).  It contains the following instruction about the Jail grievance procedure:

> GRIEVANCE PROCEDURE: An inmate may file a grievance for being subjected: 1.) To any criminal act; 2.) Prohibited act by facility staff; 3.) Breach of any civil right; 4.) Unjust restriction or denial of privileges.  Other situations constitute a complaint.  If you wish to file a grievance, a grievance form and envelope will be made available to you at your request.  Your grievance can be given to any jailer on duty.  An initial response will be returned within fifteen (15) days from the date it is received by the Grievance Officer.  Abuse of the Grievance Procedure can result in disciplinary action.

(Doc. # 49, Exhibit).  Davis insists that these were the only instructions that he received on the grievance procedure during his incarceration at the Jail and that he was unaware that an appeal was required.

version of the Inmate Handbook, the February 28, 2006 grievance form contained express instructions about the appeal requirement.  As Jail Administrator, Dicky advises that the Inmate Grievance Forms have been modified in recent years to alert Brazos County inmates that these forms can also be used to initiate an appeal.  (Doc. # 27, Exhibit 7, *Dicky Affidavit* at ¶ 12).  The grievance filed by Davis on February 28, 2006, which outlines his claim concerning the alleged refusal to provide surgery recommended by Dr. Seabolt, plainly indicates at the top of the form that it may be used for purposes of "[f]iling an appeal." (Doc. # 9, Exhibit 9, Grievance dated Feb. 28, 2006).  Although the form does appear to provide notice that Davis had an option to appeal, there is a still a question about whether the form was adequate to advise Davis that an appeal was required.

Even assuming that the form was adequate to advise Davis that an appeal was required, it is still not clear that Davis's failure to appeal the February 28, 2006 grievance constitutes a failure to exhaust remedies in this case.  The administrative response to Davis's February 28, 2006 grievance is dated March 13, 2006.  Davis was transferred from the Brazos County Jail to TDCJ on that same day.  It would appear, therefore, that any appeal filed by Davis would have been moot as the result of his transfer.  More importantly, Davis's medical records, which are summarized in greater detail below, reflect that the Jail medical department was well aware of his problem.  Based on this record, the Court concludes that genuine issues of material fact remain regarding whether the defendants had sufficient notice of Davis's need for surgery at County expense.  Therefore, the defendants are not entitled to summary judgment on the issue of exhaustion as to Davis's claim that he was denied

surgery.

### 3.     Denial of Pain Medication

Davis claims that Dr. Cherian and Sergeant Alonzo denied him adequate medical care in the form of sufficient pain management.  The record shows that Davis filed a series of grievances concerning his complaints of pain, on the following dates:  August 10, 2004, August 30, 2004, October 25, 2004, and February 28, 2006.  Those grievances are summarized briefly below.

On August 10, 2004, Davis reported that his arm was "broken," that it hurt "so bad," and that he had made "numerous" requests to "the nurse" for an appointment with a doctor. (Doc. # 27, Exhibit 9, Grievance dated Aug. 10, 2004).  There is no written administrative response to the grievance in the record.

On August 25, 2004, Davis submitted a hand-written request for medical care on notebook paper asking to see a physician and complaining that "Nurse Zegalman" failed to provide adequate care in an unspecified manner.  (Doc. # 27, Exhibit 9, Note dated August 25, 2004).  Shortly thereafter, Davis filed a formal grievance, on August 30, 2004, alleging "medical negligence."  (Doc. # 27, Exhibit 9, Grievance dated Sept. 10, 2004).[9]  Specifically, Davis complained that the Tylenol he was given was not adequate to help the pain caused by his broken arm.  (*Id.*).  There is no written administrative response to the grievance in the record.

---

[9]     Although the grievance is dated "9/10/04," the record reflects that it was received on August 30, 2004.  (Doc. # 27, Exhibit, Grievance dated Sept. 10, 2004).

On October 25, 2004, Davis complained that he was not receiving "any type of medical attention" for his arm.  (Doc. # 27, Exhibit 9, Grievance dated Oct. 25, 2004).   In particular, Davis complained that he had requested an x-ray for his arm "a few weeks back" and that Sergeant Alonzo had told him she would start the paper work.  (*Id.*).  Davis reported that an x-ray had not yet been scheduled and that his pain was increasing.  (*Id.*).  Davis explained that the pin in his arm is "poping out" and that the pain has moved to his shoulder. Davis estimated that, on a scale of 1-10, his pain level had gone from a 6-7 to an "easy 8-10." (*Id.*).  There is no written administrative response in the record to the grievance filed on October 25, 2004.

The grievance that Davis filed on February 28, 2006 also references a general failure by "jail medical staff" to offer any treatment other than [T]ylenol" for his broken right arm, which "is causing a great deal of pain and suffering." (*Id.*).  Jail officials issued a written response to this grievance on March 13, 2006, finding that Davis's complaint was unfounded.

The defendants argue that Davis did not exhaust the above-referenced allegations regarding the failure to provide adequate pain medication because he did not pursue an appeal from any of the above-referenced grievances.  It is not clear that Davis's failure to file an appeal constitutes a failure to exhaust under the circumstances in this case or whether the initial grievances that he filed were sufficient to alert Jail medical staff that Davis was in pain.  As outlined above, there was no written administrative response to the grievances filed by Davis on August 10, 2004, August 30, 2004, and October 25, 2004, and therefore nothing

18

from which to appeal.  Likewise, for reasons discussed above, it appears that Davis was unable to appeal the administrative response to his February 28, 2006 grievance, which was returned to Davis on March 13, 2006, when he was on his way to TDCJ.  The Court concludes, therefore, that genuine issues of material fact remain on the question of whether Davis sufficiently exhausted his claims about inadequate pain medication.

In conclusion, the defendants are entitled to summary judgment on the issue of whether Davis exhausted his administrative remedies with respect to his housing assignment claims.  The record confirms that he did not.  However, fact issues remain about whether Davis exhausted his administrative remedies with respect to his claim that he was denied adequate medical care in the form of surgery and pain medication.  Those claims are addressed further below, along with the defendants' arguments that they are entitled to official and qualified immunity.  First, however, the Court pauses to address Dr. Cherian's claim that she cannot be held liable under 42 U.S.C. § 1983 because she is not a "state actor."

**B.      State Actor Liability**

Davis's civil rights complaint is governed by 42 U.S.C. § 1983, which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

19

To establish liability under § 1983, a civil rights plaintiff must establish two elements:  (1) state action, *i.e.*, that the conduct complained of was committed under color of state law, and (2) a resulting violation of federal law, *i.e.,* that the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *Baker v. McCollan*, 443 U.S. 137, 142 (1979); *see also Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002) (In short, "[s]ection 1983 provides a claim against anyone who, 'under color of' state law, deprives another of his or her constitutional rights.") (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994)).

Dr. Cherian contends that she is not liable in this instance because, as a contract employee of Brazos County, she is not a state actor for purposes of 42 U.S.C. §1983.  In support, Dr. Cherian provides a copy of her contract with Brazos County and an affidavit, in which she describes herself as an "independent contractor."  (Doc. # 28, Exhibit 4A).  The contract provided by Dr. Cherian plainly engages her services to provide medical care for inmates at the Jail on behalf of Brazos County.  Dr. Cherian provides no authority showing that an independent contractor who is engaged to perform a state function is not the equivalent of a state actor for purposes of liability under 42 U.S.C. § 1983.  In fact, the opposite is true.  *See West v. Atkins*, 487 U.S. 42, 54 (1988) (holding that a physician under contract to provide medical services to state prison inmates acted under color of state law for purposes of § 1983 when undertaking his duties in treating a prisoner's injuries). Dr. Cherian's motion for summary judgment on this issue is denied.

## C.    Denial of Adequate Medical Care

Davis claims that he was denied adequate medical care in the form of surgery and that he was also denied adequate pain medication for his broken arm. The defendants move for summary judgment on Davis's claims concerning denial of medical care on the grounds that they are not liable in their official capacities as county employees and that they are further entitled to qualified immunity from suit in their personal or individual capacities. These defenses are discussed below following a summary of the care that Davis received while at the Jail.

In support of the motion for summary judgment, the defendants provide copies of Davis's medical records, documenting the care that he received after his initial arrival and incarceration at the Brazos County Jail.[10] Davis arrived at the Jail on January 23, 2004, with a broken right arm that had been surgically repaired prior to his arrest. During the intake process, Davis explained that he broke his right arm in a car accident that occurred on April 19, 2003. (KA00137-138). Davis required surgery following the accident, including the insertion of a 14 ½ inch metal rod in his right arm. (*Id.*). Davis reportedly re-injured his arm approximately three months after the surgery. (KA00046). The fracture did not heal as planned and Davis noted that the bone was "slip[ping] out of place." (KA00138). At the

---

[10]    A set of Davis's medical records are filed under seal. (Doc. # 47). Additional copies of those records are found as exhibits to the defendants' supplemental briefing on the issue of qualified immunity. (Docs. # 55, # 56). The records are in no apparent order. For ease of identification, the Court will reference the medical records when necessary by their assigned Bates number. (KA00001 to KA00431).

time that he arrived at the Jail, Davis reported that he had a prescription for the painkiller, "Vicodin." (*Id.*).

On February 21, 2004, Davis submitted a request for medical care complaining of pain in his surgically repaired broken arm. (KA00133). The examining physician prescribed medication for pain and ordered an x-ray of his right arm. (*Id.*). On March 3, 2004, Davis was examined by a radiologist at Bryan Radiology Associates, Inc., in Bryan, Texas. (KA00171). The radiologist took an x-ray of Davis's surgically repaired broken right arm. (*Id.*). The reviewing physician examined the x-ray of Davis's surgically repaired right arm and noted "an intramedullary rod crossing a midshaft fracture" of his humerus bone. (*Id.*). The physician observed that "[t]he screw maintaining the position of the rod proximally is fractured" and that the "distal screw has backed out and now is beside the bone." (*Id.*). He indicated that the rod had become loose and that there was no "osseous union" of the fracture that it was designed to repair. (*Id.*). In other words, his right humerus bone remained broken and the surgically inserted rod and screws were loose.

At the time that Davis was incarcerated, the Brazos County Jail had a written medical plan in place that was approved by the Texas Commission on Jail Standards. (Doc. # 55, Exhibit 3, Affidavit of Ana Sifuentez, Exhibits A and B). The plan is described in full in the Facility Rules that are provided to all inmates. (*Id.* at Exhibit A). The Facility Rules advise that "[n]o inmate will be denied medical, dental or health service that is requested," but makes clear that inmates are required to pay for these services when they are rendered. (*Id.* at XII Medical/Mental/Dental Services, at A). If an inmate qualifies as indigent, the county

is obligated to assist him in applying for reimbursement through the Indigent Health Care and Treatment Act, TEX. CIV. STAT. ANN. art. 4438B. (*Id.*).

This policy is consistent with state law, which provides that county jail inmates such as Davis are required to pay for any medical care that they received while in jail or, if indigent, they must agree to reimburse the county for care that is provided:

> A person who is or was a prisoner in a county jail and received medical, dental, or health related services from a county or a hospital district shall be required to pay for such services when they are rendered. If such prisoner is an eligible county resident as defined in Section 61.002, Health and Safety Code, the county or hospital district providing the services has a right of subrogation to the prisoner's right of recovery from any source, limited to the cost of services provided. A prisoner, unless the prisoner fully pays for the cost of services received, shall remain obligated to reimburse the county or hospital district for any medical, dental, or health services provided, and the county or hospital district may apply for reimbursement in the manner provided by Chapter 61, Health and Safety Code. A county or hospital district shall have authority to recover the amount expended in a civil action.

TEX. CODE CRIM. PROC. art. 104.002(1)(d). According to rules and regulations developed by the Texas Commission on Jail Standards, county jail facilities are required to have a written plan for inmate medical, mental, and dental services, including procedures for "regularly scheduled sick call requests" and for "referral" of inmates who require additional treatment. 37 TEX. ADMIN. CODE § 273.2.

The record reflects that medical personnel at the Jail took steps to diagnose Davis's problem and to refer him for additional medical treatment in accordance with its written policy and with state law. Following the March 2004 x-ray and the physician's report, Dr. Cherian contacted local orthopedic surgeons in an effort to find one who would perform

surgery to correct the "non-union fracture" of Davis's right arm.  (KA00132).  According to

the notes, no local surgeons were willing to accept Davis as a patient.  (*Id.*).  Dr. Cherian also

contacted the University of Texas Medical Branch ("UTMB") in Galveston, which provides

medical care for state prisoners incarcerated in TDCJ.  (*Id.*).  UTMB responded, however,

that it could not accept Davis either because he was not a TDCJ inmate at that time.  (*Id.*).

On March 15, 2004, Davis's father, Willie Davis, contacted the Jail medical

department and stated that he wanted his son put back on hydrocodone (*i.e.*, Vicodin) for

pain.  (KA00123).  Mr. Davis also stated that he was willing to pay for his son's doctor visit

and asked the doctor to call him to schedule an appointment.  (*Id.*).

Dr. Cherian continued to prescribe pain medication for Davis's condition, although

he was not given the Vicodin that he wanted.  (KA00121).  Dr. Cherian prescribed Bextra

instead, and also Tylenol.  (*Id.*).  On May 18, 2004, Dr. Cherian approved an arm sling.

(KA00120).

On July 21, 2004, Davis was examined by a local orthopedic specialist, Dr. Rick

Seabolt.  (KA00047).  Dr. Seabolt examined Davis and took a set of x-rays, which revealed

"a nonunion in the midshaft region" of his humerus with an "intramedullary [rod] transfixing

the fracture with no fixation distally, and a single screw proximally."  (KA00046).  Dr.

Seabolt determined that the screw at one end of the humerus was "broken" and that the other

screw had migrated into Davis's flesh.  (*Id.*).  Using his jargon, the screw was "completely

out of the bone and in the soft tissue anterior to the humerus distally."  (*Id.*).  Dr. Seabolt

noted that Davis had "full range of motion in his shoulder and elbow," and that a neurologic

exam of his hand was "normal." (*Id.*).  Because of the tenderness and the motion observed at the fracture site, Dr. Seabolt concluded that Davis "would benefit from ORIF" (which apparently stands for "open reduction internal fixation") of the broken humerus.  (*Id.*). Noting that the bone had failed to heal, Dr. Seabolt recommended removing the rod and the screws and performing an "iliac crest bone graft" to treat the humeral nonunion in Davis's right arm. (*Id.*).  Dr. Seabolt stated that, if Davis did not have this done, "he may have difficulty with pain long-term, but also would have potential problems of further cortical erosion distally of his humerus." (*Id.*).

On July 22, 2004, a nurse explained to Davis that Dr. Seabolt was willing to do the surgery but that Brazos County would not assume financial responsibility because Davis's condition stemmed from a pre-existing injury.  (KA00045).  The nurse informed Davis that Dr. Seabolt was willing to proceed with Davis as the party responsible for payment.  (*Id.*). Davis replied that he was unable to pay for the surgery.[11]  (*Id.*).  Davis continued to receive pain medication during this time.  (KA00100-103, KA00106-114).

On August 30, 2004, Sergeant Alonzo spoke with a member of Dr. Seabolt's staff regarding Davis's financial responsibility for the surgery.  (KA00044).  The staff member stated that she would contact Davis's family to see if there was "any type of insurance." (*Id.*).  Later that same day, the staff member reported that she had been in touch with Davis's family and that they were attempting to make arrangements to pay for the surgery.  (*Id.*).

---

[11]     There is a dispute about whether Davis told the nurse that he did not want surgery at this time.  Davis contends that he never refused the surgery.

On October 7, 2004, Davis was seen at the Jail clinic, where he complained about discomfort in his right arm. (KA00104). Davis asked for Viodin, but the nurse noted that this prescription from an outside source had been denied when Davis arrived at the Jail. (*Id.*). The nurse treated the arm to see if external heat or cold would help in addition to the pain medication prescribed at the Jail clinic. (*Id.*). The nurse also advised Davis that she would speak with Dr. Seabolt's office to determine if any financial arrangements had been made for the surgery. (*Id.*). After speaking with a member of Dr. Seabolt's staff, the nurse reported that no financial arrangements had been made. (*Id.*). According to the nurse, Dr. Seabolt's office had been in contact with Davis's father, who was attempting to work out an arrangement so that his son could have the surgery, but that Dr. Seabolt had not heard back from him. (*Id.*).

On October 28, 2004, Davis was taken to the emergency room at the St. Joseph Regional Health Center in Bryan, Texas, following a fight with another inmate that occurred at the Jail on October 27, 2004. (KA00021). At the emergency room, Davis reported that he was "hit with a broom" by another inmate. (KA00026). Davis stated that he felt pain in his right arm and his left forearm. (*Id.*). It was noted that Davis had a pre-existing right arm fracture. (*Id.*). It was also noted that Davis had a history of chemical dependency involving his past use of alcohol, marijuana, and opiates. (*Id.*).

At St. Joseph's Regional Health Center, Dr. Cherian requested a consultation from Dr. Seabolt. (KA00028). Davis had x-rays taken of both his left forearm and his right arm. There were no signs of fracture or dislocation on the left forearm or that there was any

damage stemming from Davis's altercation with another inmate.  (KA00021).  The x-ray of

Davis's right arm revealed that his previous fracture still had not healed.  (KA00022).  A

radiologist from Bryan Radiology Associates, Inc., reviewed the new x-rays and determined

that there had been "no change overall" since the x-ray taken previously on March 3, 2004.

(KA00170).  Davis was discharged from St. Joseph's Regional Health Center and returned

to the Jail, where he was monitored for a fever.  (KA00037).

On January 19, 2005, Davis requested another x-ray of his right arm to see if there

were "any changes."  (KA00090, KA00017).  Davis was told that an x-ray would need to be

approved and scheduled.  (KA00017).  Davis stated that his family had not yet made

arrangements to pay for the surgery recommended by Dr. Seabolt.  (*Id.*).  At the clinic later

that day, Davis claimed that the "weather" was making his arm hurt.  (KA00017).  Davis

was told to continue taking his current medication and the nurse prescribed hot showers to

alleviate some of the discomfort caused by the cold weather.  (KA00018).  Dr. Cherian

approved the request for a new x-ray.  (KA00090).

On January 24, 2005, Davis was examined at Bryan Radiology Associates and a new

x-ray was taken of his right arm.  (KA00169).  The reviewing physician noted that a

intramedullary rod was "stabilizing a mid shaft humeral fracture" and that the rod was "in

place."  (*Id.*).  The distal screw, however, was no longer inserted through the rod.  (*Id.*).  The

reviewing physician observed a "widened intramedullary space within the distal humeral

shaft distal to the fracture consistent with loosening."  (*Id.*).  The fracture line showed

"minimal bony bridging."  (*Id.*).

On July 8, 2005, Davis appeared before the 85th District Court of Brazos County in criminal cause number 04-04291 for a hearing on his motion to reduce bond.  Davis's criminal defense counsel filed a motion to reduce Davis's bond so that he could obtain surgery for his arm and recuperate at home.  Dr. Mark Sanders testified as an expert witness at the hearing after examining Davis, his medical records, and his x-rays.  (Doc. # 55, Exhibit 5, Hearing Transcript, at 10-11).  Dr. Sanders explained that Davis's fractured humerus attempted to heal but failed to do so, resulting in "hardware fatigue" and broken metal:

> [W]hen you fix a bone — a broken bone with a piece of metal, then a race starts.  There's a race to see which happens first: Does the bone heal first or does the hardware break?  In this particular case the bone did not heal so the hardware fatigued and ultimately broke, both at the shoulder and also, in this case, the screw disengaged in the area of the elbow; and this screw is still sitting there free in the soft tissue.

(*Id.* at 14-15).  Dr. Sanders explained that, because of the broken hardware, the rod in Davis's arm was serving no purpose and had become "an impediment to healing rather than a help."  (*Id.* at 18).  Dr. Sanders recommended removing the rod and screws in favor of "a plate that would fix the bone with four screws above the fracture, four screws below the fracture, and one screw that went through the fracture[.]" (*Id.*).  Dr. Sanders would then do a bone graft from Davis's hip "and would pack that bone graft entirely around the humerus." (*Id.*).  If the problem went untreated, Dr. Sanders predicted "a great deal of irritation to the radial nerve," accompanied by a loss of strength in the wrist and fingers, as well as "atrophy on the muscles on the front of the forearm which will be unreversible."  (*Id.* at 19).  Dr. Sanders predicted that the surgical procedure would require a two-to-three day hospital stay,

28

followed by four months of recuperation.  (*Id.* at 20).

On cross-examination, Dr. Sanders reported that he charged $3,000 for his expert testimony at the hearing and that his bill for the surgery "would be about $9,500."  (*Id.* at 24).  Dr. Sanders testified further that, if Davis obtained his release, arrangements had been made to pay that fee.  (*Id.*).  Dr. Sanders clarified that Davis's father told him that his son was looking forward to getting his surgery done as soon as he gets released and that Davis's father intended to make all the proper financial arrangements.  (*Id.*).  Dr. Sanders also stated that metal rods and screws are only designed to last six months.  (*Id.* at 25).  Dr. Sanders agreed that, if the arm was broken in April of 2003, then the pins and screws should have been removed in October of 2003, well before Davis was arrested and taken into custody in January of 2004.  (*Id.* at 25-26).  In other words, Dr. Sanders agreed that this is something that Davis should have taken care of before his arrest and incarceration in the Brazos County Jail.  (*Id.*).

A licensed vocational nurse assigned to work at the Brazos County Jail also testified at the July 8, 2005 bond reduction hearing.  (*Id.* at 29).  The nurse presented a summary of Davis's medical records.  She testified that precautions were taken by Jail medical staff to ensure that he received treatment.  (*Id.* at 32).  She noted that Davis had been seen by the physician on a number of occasions and that the medical staff appealed repeatedly to "several orthopedic doctors in town until [they] finally found one that would take the case.  (*Id.*).  She noted that Davis had been seen by Dr. Seabolt in July 2004, who recommended surgery and had agreed to make arrangements for payment with his family.  (*Id.* at 33).  She stated that

29

the only reason surgery was not done at that time was that Davis's family never made arrangements with the physician's office.  (*Id.*).  Davis's father was present at the hearing, but did not testify because he was charged as an accessory to the murder that his sons had been accused of committing.  (*Id.* at 44).

After hearing testimony from these witnesses, Davis's counsel asked for a bond of $100,000 so that Davis could obtain his release for the purpose of undergoing surgery.[12]  (*Id.* at 41).  The trial court denied the motion to reduce Davis's bond.  (*Id.* at 47).  The trial court did enter an order, however, directing Brazos County officials to transport Davis in the event that surgery was scheduled and "to attend to the defendant's location during the surgery and postoperative [period] until he's released from the hospital . . . back to the Brazos County Jail[.]" *Id.*  The trial court declined to specify what doctor would perform the surgery, or what hospital, but commented that he did not "see the necessity for long-distance transport to do it because it's not an extraordinary surgery."  (*Id.* at 48).

Davis continued to receive pain medication at the Jail while awaiting arrangements

---

[12]    It is not clear from the record about the amount set on Davis's original bond.  Public records show that Davis was charged with murder in connection with a "drug-related killing" and that his bond was set initially at $1 million.  *See Ex parte Davis*, 147 S.W.3d 546, 547 (Tex. App. — Waco Aug. 25, 2004).  Davis appealed the bond as excessive.  During that proceeding, the State of Texas presented evidence from a confidential informant that Trey Davis, his brother Chad, and his father, Willie Davis, were trafficking marijuana and cocaine from Mexico into the United States.  *See id.* at 549.  The murder victim in that case had allegedly "ripped off the [Davis's] for $100,000 worth of drugs and/or money." *Id.* (quotation omitted, alteration in original).  The court of appeals ultimately reduced Trey Davis's bond to $500,000.  *See id.* at 553.  Chad Davis's bail was reduced from $1 million to $750,000. *See id.*  In a dissent, Chief Justice Tom Gray disagreed with the bond reduction, noting that the "evidence shows substantial connection to international and interstate drug trafficking by the defendants, thus raising serious concerns about being a flight risk[.]" *Id.* at 554.

for his surgery.  On September 5, 2005, Davis requested a heat treatment for his arm and a "pain patch" or something stronger than the pain medication he had been prescribed. (KA00001).  Davis suggested trying another brand of "Buspar." (*Id.*).  Dr. Cherian approved another x-ray of Davis's right arm.  (*Id.*).

On September 9, 2005, Davis was examined at Bryan Radiology Associates, where a radiologist took an x-ray of his right humerus. (KA000168).  The physician who reviewed the x-ray did not have access to the previous x-rays taken of Davis's right arm, but he made the same observations about Davis's condition.  In that regard, the reviewing physician noted that there was "an intramedullary rod transfixing a midshaft fracture of the right humerus," which had not healed, and that the screws holding that rod in place had broken or become dislodged.  (*Id.*).

On October 16, 2005, Davis submitted a medical request for assistance and complained that his arm was "verry [sic] painful." (KA00061).  On October 24, 2005, Davis was transported to Dr. Seabolt's office for an examination.  (*Id.*).  Dr. Seabolt noted that Davis's pain was "worsening" and he again recommended surgery to repair the nonunion fracture.  (*Id.*).  On that date, Davis was asked whether he had taken the opportunity to speak with his family yet about financial arrangements for the surgery.  (*Id.*; KA00058).  Davis replied that he would call his father that evening and would get back to them.  (*Id.*).  Davis was informed that Dr. Seabolt's office had made inquiries to the hospital and to the anesthesiology department and that he was waiting on a response from Davis.  (*Id.*).

On October 28, 2005, Dr. Seabolt's office reportedly spoke with Davis's father.

31

(KA00065).  Davis's father told them that he would not be able to pay for his son's surgery because all of his assets had been "seized" by the Internal Revenue Service.  (*Id.*).  Davis was advised that, if he were able to make other financial arrangements for the surgery, the Jail medical staff would schedule the proceeding.  (*Id.*).  In the interim, Davis would continue to receive pain medication to relieve his discomfort.  (*Id.*).  Davis acknowledged that he understood.  (*Id.*).

The medical record contains a variety of other medical request forms from Davis from November 2005, through the end of February 2006.  (KA00048-57, KA00020, KA00098).  These requests concern his prescription for acid reflux medication (Prilosec), a refill of hydrocortisone cream to treat a "under arm rash," an increase in his prescription for an anti-depressant (Elavil).  These records do not contain any additional complaints about pain in Davis's right arm.  After he was convicted of the criminal charges against him, Davis requested a copy of his medical records on February 13, 2006.  (KA00048).  Davis was told that a copy would be sent to TDCJ. (*Id.*).

Davis was transferred to TDCJ on March 13, 2006.  Davis advises that, shortly after he arrived at TDCJ, he had an operation on his right arm.  (Doc. # 48, Exhibit, Plaintiff's Sworn Declaration, at ¶ 54).  Davis complains that he endured constant pain during the time that he was in the Brazos County Jail from January 23, 2004, through March 13, 2006, and that, because of the two-year delay, his second surgery was not successful and that he is now "permanently crippled" as a result of the defendants' deliberate indifference.  (*Id.* at ¶ 55).

### 1.    Official Capacity

Sheriff Kirk and Sergeant Alonzo maintain that Davis has failed to articulate a valid claim against them in their official capacities under any theory lodged in the complaint.[13] These defendants note, correctly, that a suit against them in their official capacity as government employees is really a suit against Brazos County.

As a unit of local government, Brazos County cannot be held liable under 42 U.S.C. § 1983 for the actions of officers or employees on a theory of *respondeat superior.  Monell v. New York Dep't of Social Serv.*, 436 U.S. 658, 691 (1978).  A municipality such as Brazos County is only liable under § 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy.  *Id*. at 694. Thus, municipal liability under § 1983 requires proof of three elements in addition to the underlying claim of a violation of rights: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."  *Cox v. City of Dallas, Tex*., 430 F.3d 734, 748 (5th Cir. 2005) (citations omitted), *cert. denied*, — U.S. —, 126 S. Ct. 2039 (2006).

Sheriff Kirk and Sergeant Alonzo argue that Davis has not demonstrated that he suffered harm as the direct result of an official policy.  "An 'official policy' is either a policy statement, ordinance, regulation, etc., that has been officially adopted by a policymaker, or a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute

---

[13]    Dr. Cherian has not moved for summary judgment on this ground, although she does assert the defense of qualified immunity.  (Docs. # 28, # 53).

a custom that fairly represents the municipality's policy." *Cox*, 430 F.3d at 748 (citing *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 289 (5th Cir. 2002)).

The pleadings and the exhibits reflect that, contrary to the defendants' assertion, there is a policy at issue in this case. The policy at issue is the one adopted by Brazos County, and Sheriff Kirk, and enforced by the Jail medical department, which requires county inmates to be financially responsible for the medical, dental, and other health related services that they receive. Under this policy, which is described in more detail above, inmates must pay for these services when the treatment is received if they are able to do so. (Doc. # 55, Exhibit 3, Affidavit of Ana Sifuentez, Exhibits A and B) (describing the written medical plan in place at the Brazos County Jail. If they are indigent and unable to pay, they must still make arrangements to reimburse the county or hospital district for the care that they receive.

On its face, the policy is consistent with Texas law which provides that counties are liable for an inmate's medical expenses if the inmate is indigent. *See* TEX. CODE CRIM. PROC. art. 104.002 (Vernon 2006). *See Bihms v. Klevenhagen*, 928 F. Supp. 717, 718 (S.D. Tex. 1996) (upholding the constitutionality of the policy). Here, however, a question of fact remains about whether Davis was indigent and unable to pay for his medical care. Although Davis's father repeatedly assured that he would pay for the surgery, the record demonstrates that there was substantial delay. In any event, Davis was an adult. There is no evidence that his father had any obligation to pay for Davis's surgery or other expenses incurred by Davis. The record further shows that Jail medical staff was aware on October 28, 2005, that Davis's father would not finance the surgery. Thus, there is a genuine issue of material fact about

whether the policy was the moving force behind the alleged denial of care.  Accordingly, the defendants are not entitled to summary judgment on the issue of official immunity.

### 2.  Qualified Immunity

In addition, Sheriff Kirk and Sergeant Alonzo contend that they are entitled to qualified immunity from Davis's substantive claims against them in their individual or personal capacity.  Dr. Cherian also asserts that, to the extent that she could be considered a state actor, she is entitled to qualified immunity as well.

Public officials acting within the scope of their authority are shielded from civil liability by the doctrine of qualified immunity if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Even if a defendant's actions have violated a constitutional right, qualified immunity is nonetheless appropriate if "the defendant's actions were 'objectively reasonable' with reference to 'clearly established law' at the time of the conduct in question."  *Castillo v. City of Weslaco*, 369 F.3d 504, 506 (5th Cir. 2004) (quoting *Petta v. Rivera*, 133 F.3d 330, 334 (5th Cir. 1998)).

Officials sued in their individual capacities are protected by qualified immunity unless the alleged act violates a constitutional right that was clearly established at the time.  *Sanchez v. Swyden*, 139 F.3d 464, 466-67 (5th Cir. 1998).  "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions."  *Cozzo v. Tangipahoa Parish Council – President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Thompson v. Upshur Cty.,* 245 F.3d 447, 456 (5th

35

Cir. 2001)). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

In assessing qualified immunity, the Court must conduct a bifurcated analysis. *See, e.g., Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir. 2004).  The first step has two parts: First, the Court must decide whether the plaintiff alleged a constitutional violation, and that the violation is of a clearly established constitutional right.  *Id.*; *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  To be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If the defendants' actions violated a clearly established constitutional right, the final step of the analysis asks whether qualified immunity is appropriate, nevertheless, because the defendants' "actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins,* 382 F.3d at 537.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense.  *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Id*. The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the

36

reasonableness of the official's conduct. *Id.*

In the summary judgment context, a determination whether a constitutional right was violated for purposes of the first prong of the qualified immunity enquiry overlaps substantially with the defendants' contention that Davis's claims against them lacks merit. It is well established that if the defendant's conduct did not violate a constitutional right, then the defendant is entitled to qualified immunity and it is unnecessary to consider whether the asserted right was "clearly established." *Chavez v. Martinez*, 538 U.S. 760, 766 (2003); *see also Martinez v. Texas Dep't of Crim. Justice*, 300 F.3d 567, 577 (5th Cir. 2002) (finding that, because plaintiff's First Amendment retaliation claim failed, the defendants were entitled to qualified immunity because plaintiff failed to establish a constitutional violation under the first prong of the qualified immunity analysis).

As outlined above, Davis claims that the defendants denied him adequate medical care in the form of surgery and pain management for a broken arm. Davis's claim for denial of adequate medical care is governed by the deliberate-indifference standard found in the Eighth Amendment to the United States Constitution.[14] "Although the Eighth Amendment 'does not, by its precise words, mandate a certain level of medical care for prisoners[,]' the

---

[14]    It appears from the record that Davis was a pretrial detainee for most of his stay at the Brazos County Jail, although he was convicted at some point in February of 2006. The Fifth Circuit has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care. *See Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) (citing *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996) (en banc)), *cert. denied*, 534 U.S. 1136 (2002). Accordingly, the same standard governs constitutional claims concerning medical care by pretrial detainees and convicted inmates. *See id.*

Supreme Court has interpreted it as imposing a duty on prison officials to 'ensure that inmates receive adequate . . . medical care.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Easter*, 467 F.3d at 463 (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).

The deliberate-indifference standard has both an objective and subjective component. *See Farmer*, 511 U.S. at 834. To establish deliberate indifference under this standard, the prisoner must show that the defendants were both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *See id.* at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). Under the subjective prong of this analysis, "[a] prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 347 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847).

The Fifth Circuit has stated that the deliberate-indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical

treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 347 (citations omitted). Likewise, "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Id.* A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (citations omitted).

Davis does not dispute that he was afforded some medical treatment at the Jail and that he was examined by a local orthopedic surgeon. Thus, the defendants attempt to characterize Davis's claims as mere disagreement about the level of care that he received. Davis's allegations, however, concern more than mere disagreement with the care that was provided. Davis contends that he was deliberately denied surgery that was needed for his broken right arm, which was causing him constant pain. He contends further that he was denied adequate medication to treat his pain and that the medication that was prescribed caused him to suffer stomach ulcers and gastrointestinal distress. Davis points to evidence in the record which raises a genuine issue of material fact about whether the defendants refused to treat him by authorizing surgery at the County's expense when they knew or should have known that he was indigent. Davis also raises fact issues about whether the defendants ignored his complaints of increasing pain after October of 2005, when medical staff at the Jail knew that Davis's family was not going to pay for the surgery. Fact issues remain, moreover, on whether the defendants' actions were objectively unreasonable under the circumstances presented. Accordingly, the defendants are not entitled to summary

judgment on the issue of qualified immunity.

## IV.    PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL

The plaintiff has filed more than one motion for appointment of counsel.  (Docs. # 4, # 13, # 17).   The Court denied the plaintiff's motion, initially, in order to review the defendants' motions for summary judgment and the plaintiff's medical records.   After completing this review, the Court concludes that exceptional circumstances require the appointment of counsel to assist the plaintiff with the remainder of this case.   Accordingly, the plaintiff's most recent motion for appointment of counsel (Doc. # 17) will be granted.

## V.    <u>CONCLUSION AND ORDER</u>

Accordingly, based on the foregoing, the Court **ORDERS** as follows:

1.    The defendants' amended motions for summary judgment (Docs. # 27, # 28) are **DENIED** with respect to Davis's claims that he was denied adequate pain medication and surgery for a broken arm.

2.    The amended motion for summary judgment by Sheriff Kirk (Doc. # 27) is **GRANTED**, however, with respect to Davis's claims concerning the adequacy of his housing.

3.    The plaintiff's motion for appointment of counsel (Doc. # 17) is **GRANTED**.

4.    The Court will enter a separate order appointing counsel for the plaintiff and will set this case for a pretrial conference.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas, on December 11th, 2007.

Nancy F. Atlas
United States District Judge